## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 14-cv-80574-MIDDLEBROOKS/BRANNON

CRAIG S. TULEPAN,

      Plaintiff,

v.

BOB ROBERTS,

      Defendant.

_____/

### ORDER

THIS CAUSE comes before the Court upon Defendant's Motion for Partial Summary Judgment [DE 64] and Defendant's Motion to Dismiss the Amended Complaint for Failure to Join Indispensable Parties [DE 70]. Defendant's Motion for Partial Summary Judgment [DE 64] was filed on November 6, 2014. Plaintiff Craig Tulepan ("Plaintiff") filed a Response [DE 75] on November 25, 2014, to which Defendant filed a Reply [DE 86] on December 12, 2014. Defendant's Motion to Dismiss the Amended Complaint for Failure to Join Indispensable Parties [DE 70] was filed on November 17, 2014. Plaintiff filed a Response [DE 77] on November 27, 2014, to which Defendant filed a Reply [DE 85] on December 10, 2014. For the reasons that follow, Defendant's Motion for Partial Summary Judgment [DE 64] is granted and Defendant's Motion to Dismiss the Amended Complaint for Failure to Join Indispensable Parties [DE 70] is denied.

### BACKGROUND

This matter arises out of an employment contract dispute between Plaintiff Craig Tulepan ("Plaintiff") and Defendant Bob Roberts ("Defendant"). Defendant owns and operates his

deceased wife Lucille Roberts' fitness-club business and invests its income in various enterprises through an unincorporated entity known as "The Roberts Organization." [DE 11 at ¶ 6]. Plaintiff and Defendant met in late September 2001, after Defendant advertised that he was looking to hire someone to manage and expand his real estate holdings, and Plaintiff responded. [DE 74 – Ex. 2, Tulepan Depo. at 7, 9]. Plaintiff and Defendant met twice in September of 2001. [*Id.* at 68]. During their second meeting, they discussed an employment arrangement under which Plaintiff would find locations for and manage the leases of Lucille Roberts' health clubs in New York in exchange for a salary of $125,000 and an expense allowance. [DE 74 – Ex. 2, Tulepan Depo. at 69; DE 74 – Ex. 1, Roberts Depo. at 29-31]. Around that time, Plaintiff owed the IRS over $100,000, which Defendant also paid. [DE 74 – Ex. 2, Tulepan Depo. at 69-70]. According to Defendant, Lucille Roberts paid Plaintiff's paychecks at that time. [DE 74 – Ex. 1, Roberts Depo. at 32]. No writing memorializes the 2001 agreement. [*Id.* at 29].

In late 2002, Plaintiff ceased managing Lucille Roberts' health clubs, and began seeking suitable locations for the purchase of real estate on behalf of various entities in which Defendant held an interest. [DE 74 – Ex. 2, Tulepan Depo. at 32-37]. Upon the purchase of two Florida-based shopping centers for Defendant – Somerset Shoppes and Catalina Shoppes – Plaintiff relocated to Florida to manage, lease, and maintain the shopping centers. [DE 74 – Ex. 2, Tulepan Depo. at 39; DE 74 – Ex. 1, Roberts Depo. at 30-32]. In 2003, Tulepan Management, LLC ("Tulepan Management") was formed to manage Defendant's real estate in Florida. Plaintiff was in charge of management and leasing for Tulepan Management and opened an office in Coral Springs, Florida. [DE 65 at ¶ 15; DE 75 at ¶ 15; DE 74 – Ex. 2, Tulepan Depo. at 41, 44, 67].

On June 25, 2004, Plaintiff and Defendant executed a written Employee Compensation contract ("Employee Compensation Agreement")[1]. [DE 11-1].  It provided that beginning in July 1, 2004, Plaintiff was to be provided with a base salary of $125,000, a $25,000 "transaction fee," and a $50,000 expense allowance.  It also described a two-part bonus provision. [*Id.*]. First, Plaintiff was entitled to a bonus of 5% of the increase in the net operating income from the prior year as presented on internal financial statements, not including mortgage interest expenses.  If there was a decrease in the net income, 5% of the decrease would be "deducted from any employee bonus." [*Id.*].  Second, Plaintiff was entitled to 5% of the increase in the value of the property from the purchase date to be determined five years after the purchase date. [*Id.*; DE 74 – Ex. 2, Tulepan Depo. at 72-73].  The Employee Compensation Agreement defined its term as "5 years with provision for extension if agreed to by both parties; 90 written notice to terminate by either party." [DE 11-1].  Finally, the Employee Compensation Agreement provided that "[i]n the event that this arrangement is terminated by either party, employee will receive compensation above, prorated to the date of termination.  Bonus . . . will be paid out over 2 years as stated above." [*Id.*].  Both Plaintiff and Defendant signed the Employee Compensation Agreement. [*Id.*].

In 2007, Plaintiff claimed he was entitled to two bonuses under Paragraph 5(b) of the Employee Compensation Agreement [DE 11-1] totaling $2,445,000.00, and Defendant claims Plaintiff received [$2,445,000.00] in accordance Paragraph 5(b) of the Employee Compensation Agreement. [DE 74 – Ex. 2, Tulepan Depo. at 87-88; DE 74-3, Responses 19, 20].  According to the Amended Complaint:

---

[1] Plaintiff refers to this Agreement as the "Employment Contract." [DE 11 at ¶ 10].

Mr. Tulepan offered[2], in lieu of receiving the bonus payments, to take an equity interest in Somerset Shoppes and Catalina Shoppes. Mr. Tulepan made the offer to demonstrate his loyalty to Mr. Roberts. Mr. Roberts immediately agreed to the investment, and expressed his enthusiasm for the arrangement and its effect of aligning the parties' interests in increasing the value of the properties.

* * *

The parties agreed that, in exchange for the investments, Mr. Tulepan would receive an equity interest in the two properties equivalent to the investments' percentage of the properties' values. Mr. Tulepan's investment in Somerset Shoppes amounted to 2.05 percent of its value. Mr. Tulepan's investment in Catalina Shoppes amounted to 2.41 percent of its value. The parties additionally agreed that Mr. Tulepan would not receive any distributions on his equity interest, but that, in lieu of distributions, Mr. Tulepan would be paid six percent interest on the invested funds – $85,200 per year on the Somerset Shoppes investment, and $61,500 per year on the Catalina Shoppes investment. Together, the investments would generate $146,700 in interest each year, payable in monthly installments of $12,225.

The parties agreed, also, on payments owed to Mr. Tulepan upon any sale or refinance of either property. Upon a sale, Mr. Roberts would pay Mr. Tulepan his percentage share of the net proceeds. Upon a refinancing, Mr. Roberts would pay Mr. Tulepan his percentage share of any increase in the refinanced mortgage amount over the original mortgage. The parties agreed that any appraisals of the properties required to implement their agreement would be conducted jointly.

The parties did not execute a writing to memorialize their agreement or any of its terms – that Mr. Tulepan would invest the $2.445 million bonus payment in Mr. Roberts's properties, or the amount of equity Mr. Tulepan would receive in exchange for his investment, or the interest to be paid in consideration for the use of the funds, or the payments owed upon any sale or refinancing of the properties. Instead, as had been their practice, the parties once again proceeded by handshake – by oral agreement (hereafter, the "Investment Agreement").

[DE 11 at ¶¶ 20, 22-25].

On January 1, 2008, to implement the Investment Agreement's equity provisions, Plaintiff, the Kevin Roberts Trust, and the Kirk Roberts Trust executed Amended and Restated Operating Agreements ("Amended Operating Agreements") with Catalina Shoppes

_____

[2] In the Amended Complaint, Plaintiff alleges that it was his idea to invest his bonuses in Catalina and Somerset. [DE 11 at ¶ 20]. However, in deposition, Plaintiff testified that it was Defendant's idea. [DE 74 – Ex. 2, Tulepan Depo. at 106-110].

Management, LLC and Somerset Shoppes Management, LLC. *See* [DE 65-4; DE 65-5]. The Amended Operating Agreements contain integration clauses which provide: "This Agreement embodies the entire agreement and understanding among the Manager and the Members and supersedes all prior agreements and understandings, if any, among and between the Manager and Members relating to the subject matter hereof." [*Id.* at Sec. 15.9]. Pursuant to the terms of the Agreements, Plaintiff became a non-voting "Class B Member" of both entities, with a 2.05% ownership interest in Somerset Fla, LLC and a 2.41% ownership interest in Catalina Fla, LLC. [DE 65-4 at 6, 31, Schedule A; DE 65-5 at 6, 31, Schedule A]. Prior to August 5, 2013, Plaintiff never demanded that his 2007 bonuses be paid to him in cash. [*Id.* at 109-110]. Had Plaintiff received the bonus in cash, he would have had to pay United States income taxes on it. [*Id.* at 112-113].

Between 2006 and 2008, Plaintiff acquired and managed a number of other Florida-based shopping centers on Defendant's behalf, including Westview Shoppes, Coral Square Shoppes, Plantation Shoppes, Orange Avenue Shoppes, Orange Avenue Mart, and Indrio Road Shoppes. [DE 74 – Ex. 2, Tulepan Depo. at 49-59]. Around 2007, Plaintiff's base compensation increased to $186,000. [DE 74 – Ex. 2, Tulepan Depo. at 82-83]. However, a Restated Employee Compensation Agreement ("Restated Employee Compensation Agreement")[3] reflecting this increase in salary was not prepared until May 10, 2010.[4] [DE 1-2]. The Restated Employee Compensation Agreement was signed by Plaintiff, but does not appear to have been signed by

---

[3] Plaintiff refers to this Agreement as the "Restated Employment Contract." [DE 11 at ¶ 30].
[4] Plaintiff alleges that the Restated Employee Compensation Agreement reflects his increased base salary, but does not reflect his increased compensation paid through CST Heron Management by Somerset Shoppes Management LLC [DE 74 – Ex. 6 at 1, ¶ 4] or Catalina Shoppes Management LLC [DE 74 – Ex. 6 at 1, ¶ 4]. *See* [DE 74 at ¶ 51].

Defendant. [*Id.*]. In August of 2013, Plaintiff was fired. [DE 74 – Ex. 2, Tulepan Depo. at 90, 164].

On April 30, 2014, Plaintiff filed a Complaint against Defendant, which he amended on May 14, 2014. [DE 1, 11]. The Amended Complaint alleges that Defendant's "abrupt termination of [Plaintiff's] employment, without cause and without pay, breached the Restated Employment Contract's five-year term, breached its requirement that any termination be preceded by a 90-day notice, and breached the duty of trust that [Defendant] owed to [Plaintiff]." [DE 11 at ¶ 50]. The Amended Complaint further alleges that Defendant "refuses to pay [Plaintiff's] income, expenses, bonuses, and interest payments accrued and owed under the parties' contracts, and refuses to return [Plaintiff's] investments in [Defendant's] properties." [*Id.* at ¶ 1]. Plaintiff alleges six Counts against Defendant: Count I – Conversion; Count II – Violation of Florida Civil Theft Statute, Fla. Stat. § 772.11; Count III – Breach of Trust/Constructive Fraud; Count IV – Recovery of Unpaid Wages; Count V – Breach of Employee Compensation Contract; and Count VI – Breach of Investment Agreement.

## I.   **MOTION FOR SUMMARY JUDGMENT [DE 64]**

Defendant moves to dismiss the Amended Complaint for failure to state a claim [DE 14] and for partial summary judgment as to Counts I, II, III, IV, and V[5] of the Amended Complaint. [DE 64].

## **STANDARD**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.

---

[5] Although Defendant labels his Motion for Partial Summary Judgment as pertaining to Counts I, II, III, and IV of the Complaint, the Motion argues that summary judgment should also be granted as to Count V. *See* [DE 64 at 10-13].

R. Civ. P. 56(a). The movant "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)(1)(A)). Where the non-moving party bears the burden of proof on an issue at trial, the movant may simply "[point] out to the district court that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

After the movant has met its burden under Rule 56(c), the burden shifts to the non-moving party to establish that there is a genuine issue of material fact. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585 (1986). Although all reasonable inferences are to be drawn in favor of the non-moving party, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986), he "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. The non-moving party may not rest upon the mere allegations or denials of the adverse party's pleadings, but instead must come forward with "specific facts showing that there is a *genuine issue for trial*." *Id.* at 587 (citing Fed. R. Civ. P. 56(e)). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Id.* "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990). If the non-moving party fails to make a sufficient showing on an essential element of his case on which he has the burden of proof, the moving party is entitled to a judgment as a matter of law. *Celotex Corp.*, 477 U.S. at 323.

## **Discussion**

7

**Count I: Conversion**

Conversion is "the exercise of wrongful dominion or control over property to the detriment of the rights of the actual owner." *Bel-Bel Int'l Corp. v. Cmty. Bank of Homestead*, 162 F.3d 1101, 1108 (11th Cir. 1998) (applying Florida law).   In other words, conversion is possession of:

> a chattel which so seriously interferes with the right of another to control it that the actor may justly be required to pay the other the full value of the chattel. Conversion is the direct antonym of permission. The two cannot exist simultaneously.  Constructive conversion takes place when a person does such acts to the goods of another as amounting in law to appropriation of the property.

90 C.J.S. Trover and Conversion § 1.   Where an owner gives another permission to take possession of his property, he must terminate that permission by requesting return of the property before continued possession by the non-owner will constitute a conversion.  *Id*.   Neither knowledge nor intent is required to establish a claim for conversion.  *See, e.g.*, *United States v. Bailey*, 288 F. Supp. 2d 1261, 1264 (M.D. Fla. 2003), *aff'd*, 419 F.3d 1208 (11th Cir. 2005).   In fact, "the tort may be established despite evidence that the defendant took or retained property based on the mistaken belief that he had a right to possession."   *Id*. (internal quotations and citations omitted).   "Evidence of wrongful intent need only be established where punitive damages are sought in connection with the tort."  *Id*.

Florida adheres to the common-law formulation of the tort of conversion, rather than the more liberal modern rule. *United States v. Bailey*, 419 F.3d 1208, 1214 (11th Cir. 2005).   Under the common law rule, the right to possession at a future time is insufficient to maintain an action for conversion.  *Id*.   "The tort of conversion applies to many types of personal property, including money.  In an action for conversion of money, the money must be specific money that

is capable of identification." *Navid v. Uiterwyk Corp.*, 130 B.R. 594, 595 (M.D. Fla. 1991).

Thus, to state a claim for conversion of money under Florida law:

> a plaintiff must demonstrate, by a preponderance of the evidence: (1) specific and identifiable money; (2) possession or an immediate right to possess that money; (3) an unauthorized act which deprives plaintiff of that money; and (4) a demand for return of the money and a refusal to do so.

*Bailey*, 288 F. Supp. 2d 1261, 1264.

In Count I, Plaintiff alleges that Defendant has refused to pay money owed to Plaintiff under the Restated [Employee Compensation Agreement] and the "Investment Agreement." [DE 11 at ¶¶ 85-86]. Plaintiff further alleges that "[b]y counsel, [Defendant] repudiated the Restated Employment Contract and the Investment Agreement." [*Id.* at ¶ 87]. "As a result of the repudiation, if not before," Plaintiff argues he "is entitled to the immediate return of his investment in Somerset Shoppes and Catalina Shoppes," in the amounts of $1,420,000 and $1,025,000, respectively, along with other money owed to him under the contracts. [*Id.* at ¶ 88].

Defendant argues that summary judgment should be granted as to Plaintiff's conversion claim because "[e]ach and every one of the damage claims alleged are specifically addressed by the terms of the parties written contracts. These [constitute] nothing more than a simple debt which can be discharged by the payment of money, which cannot generally form the basis of a claim for conversion or civil theft." [DE 64 at 15] (internal quotations and citations omitted). In response,[6] Plaintiff argues that *Tiara Condominium Ass'n v. Marsh & McLennan Companies, Inc.*, 110 So. 3d 399, 407 (Fla. 2013) "leaves Florida law unsettled on the extent to which tort claims between parties in contractual privity may proceed," and that there are "intentional tort claims separate from the contract claims." [DE 20 at 5].

---

[6] Plaintiff fails to specifically address this argument in his Response to Defendant's Motion for Summary Judgment, *see* [DE 75], but does so in his Response to Defendant's Motion to Dismiss for Failure to State a Claim. *See* [DE 20].

The Eleventh Circuit and Florida courts have consistently held that "a conversion action is not an appropriate means of vindicating a claim which essentially alleges breach of contract." *Misabec Mercantile, Inc. De Panama v. Donaldson, Lufkin & Jenrette ACLI Futures, Inc.*, 853 F.2d 834, 838 (11th Cir. 1988) (citing *Advanced Surgical Technologies, Inc. v. Automated Instruments, Inc.*, 777 F.2d 1504, 1507 (11th Cir. 1985) (applying Florida law). To establish a viable claim for civil theft or conversion where the parties have a contractual relationship, the civil theft or conversion must go beyond, and be independent from, a failure to comply with the terms of the contract. *Walker*, 59 So. 3d at 190 (citing *Ginsberg v. Lennar Fla. Holdings, Inc.*, 645 So.2d 490, 494 (Fla. 3d DCA 1994)).

Plaintiff argues, however, that *Tiara Condominium* "leaves Florida law unsettled on the extent to which tort claims between parties in contractual privity may proceed." In *Tiara Condominium*, the Florida Supreme Court reviewed the original purpose and development of the economic loss rule, a judicially-created doctrine that sets forth the circumstances under which a tort action is prohibited if the only damages suffered are economic losses. *Tiara Condominium Ass'n, Inc.*, 110 So. 3d at 401. Noting that the rule has been applied in some cases to situations well beyond that original intent, the court in *Tiara Condominium* held that the economic loss rule is limited to the products liability context. However, as Justice Pariente states in her concurring opinion, the holding:

> is not a departure from precedent, but instead simply represents the culmination of the [c]ourt's measured articulation of the economic loss rule's original intent. . . . [The] decision is neither a monumental upsetting of Florida law nor an expansion of tort law at the expense of contract principles. To the contrary, the majority merely clarifies that the economic loss rule was always intended to apply only to products liability cases.

*Tiara Condo. Ass'n*, 110 So. 3d at 408 (Pariente, J. concurring). In other words, *Tiara Condominium* does *not* overrule common law contract principles. As Justice Pariente observes,

common law contract principles behave similarly to the economic loss rule in that, for a plaintiff in contractual privity to bring a valid tort claim, he must still prove the tort is independent of any breach of contract. *Id.* (citing Lewis v. Guthartz, 428 So. 2d 222, 224 (Fla. 1982). Thus, even in light of *Tiara Condominium*, fundamental contract principles continue to bar a tort claim where a defendant has not committed a breach of duty independent of his breach of contract. *Id.*

Plaintiff also argues, however, that "the facts alleged in the Amended Complaint do in fact state intentional tort claims separate from the contract claims." [DE 20 at 5]. Specifically, Plaintiff argues, Defendant:

> repeatedly acknowledged his agreements and his debts to [Plaintiff], yet still refused to return [Plaintiff's] investment to him, and still refused to pay him the unpaid wages and interest owed under the agreements, without providing any reason for withholding them. . . . [Defendant's] numerous statements that he was indebted to [Plaintiff], followed by his repudiation of those debts and refusal to return funds that he concededly owed, are extracontractual events that elevate the facts as pleaded from a contract claim to a conversion and civil theft claim.

[DE 20 at 6-7].

The Amended Complaint specifically states that Defendant failed to pay Plaintiff wages owed under "under the Restated [Employee Compensation Agreement]." [DE 11 at ¶ 85]. These include a "$25,000 transaction fee owed upon the closing of the 2012 Somerset Shoppes refinancing; [t]wenty-one months of compensation and expenses owed for the remainder of the Contract's five-year term, from August 6, 2013, to May 10, 2015, in the amount of $439,670; [and b]onus owed under Paragraph 5(b), in an amount believed to exceed $1.2 million." [*Id.*]. The Amended Complaint further alleges that Defendant refused to pay Plaintiff other money owed "under the Investment Agreement." [*Id.* at ¶ 86]. This includes "[b]onus owed upon the 2012 Somerset refinancing, in the amount of $246,000; [and] . . . interest on [Plaintiff's] investment in Somerset Shoppes and Catalina Shoppes, currently in the amount of $97,800, and

increasing by $12,225 each month." [*Id.*].  Plaintiff also alleges that Defendant refuses to return Plaintiff's "investment in Somerset Shoppes and Catalina Shoppes, in the amount of $1,420,000 for Somerset Shoppes and $1,025,000 for Catalina Shoppes." [*Id.* at ¶ 88].

It is undisputed that all of the sums at issue in Count I are allegedly owed to Plaintiff under either "the Restated [Employee Compensation Agreement]," or "the Investment Agreement." [*Id.* at ¶¶ 84 – 92].  Despite Plaintiff's unsupported assertions to the contrary, a breach of contract claim does not simply turn into a conversion claim because a defendant *knowingly* breached his contract.  Given that neither knowledge nor intent is required to establish a claim for conversion, Plaintiff's assertions that Defendant *knew* he owed Plaintiff unpaid wages under the contracts and nevertheless refused to pay them, are inapposite.  Accordingly, because there is no evidence in the record to support a conversion claim as to Plaintiff's unpaid wages, beyond and independent from Defendant's alleged failure to comply with the terms of the parties' contracts, Defendant's motion for summary judgment is granted as to Plaintiff's conversion claim for unpaid wages.

Plaintiff also invested $2,445,000 of his bonuses, specifically $1,420,000 into Somerset Shoppes Management, LLC and $1,025,000 into Catalina Shoppes Management, LLC, to acquire his Class B interests in those entities.  Plaintiff demands the return of his investments, along with payment of the interest owed on them. [DE 11 at ¶¶ 89, 98].  As Plaintiff notes, this "investment was not memorialized by a written contract – it was an oral agreement based on trust, on a handshake." [DE 20 at 7] (citing [DE 11, ¶ 25]).  It is undisputed that Plaintiff and Defendant agreed to invest Plaintiff's bonus into Somerset and Catalina. [DE 11 at ¶ 20; DE 74 at ¶ 21; DE 74 – Ex. 4, Mandell Depo. at 32-33; DE 74 – Ex. 2, Tulepan Depo. at 107, 109-113].  Accordingly, the investment of Plaintiff's $2,445,000 bonus into Somerset and Catalina was not

"an *unauthorized* act [depriving] plaintiff of that money," as is required to bring a claim for conversion of money under Florida law. *See, e.g., Bailey*, 288 F. Supp. 2d 1261, 1264 (emphasis added).

Indeed, the Investment Agreement was subsequently memorialized in the Amended and Restated Operating Agreements with Catalina Shoppes Management, LLC and Somerset Shoppes Management, LLC. Plaintiff, the Kevin Roberts Trust, and the Kirk Roberts Trust were the parties to those agreements, along with Catalina Shoppes Management, LLC and Somerset Shoppes Management, LLC. [DE 65-4; DE 65-5]. The Amended Operating Agreements make Plaintiff a non-voting "Class B Member" of both entities, with a 2.05% ownership interest in Somerset Fla, LLC and a 2.41% ownership interest in Catalina Fla, LLC. [DE 65-4 at 6, 31, Schedule A; DE 65-5 at 6, 31, Schedule A]. Under the terms of the Amended Operating Agreements, Plaintiff is only, potentially, entitled to a return of his investment upon the sale of each shopping center, which is the principle asset of each limited liability company. [DE 74 – Ex. 2, Tulepan Depo. at 228, 231-235; DE 65-4 – Ex. D at Sec. 2.23, 4.1(d)(iv), Articles 4-5, 11; DE 65-5 – Ex. E at Sec. 2.23, 4.1(d)(iv), Articles 4-5, 11]. Plaintiff understood the ramifications of his Class B membership interest before he signed the Amended Operating Agreements. [DE 74 – Ex. 2, Tulepan Depo. at 211-213, 216-219, 222-227; DE 74 – Ex. 4, Mandell Depo. at 41-42, 45-52, 110]. The Parties do not dispute that the shopping centers have not been sold and that Plaintiff continues to own and possess his Class B membership interests in both entities. [DE 74 – Ex. 2, Tulepan Depo. at 197]. As such, Plaintiff cannot show "possession or an immediate right to possess" the $2,445,000 at issue, as is also required to bring a conversion claim for money under Florida law. Accordingly, Defendant's motion for summary judgment is granted as to Count I.

### Count II:  Violation of Florida Civil Theft Statute, Fla. Stat. § 772.11

A cause of action for civil theft under Florida law "derives from two statutory sources: the criminal section setting forth the elements of theft, and the civil section granting private parties a cause of action for a violation of the criminal section." *Palmer v. Gotta Have it Golf Collectibles, Inc.*, 106 F. Supp. 2d 1289, 1303 (S.D. Fla. 2000) (quoting *Ames v. Provident Life and Accident Ins. Co.*, 942 F. Supp. 551, 560 (S.D. Fla. 1994), *aff'd*, 86 F. 3d 1168 (11th Cir. 1996)).  Thus, to maintain a cause of action under the Florida Civil Theft Statute, a plaintiff "must show by 'clear and convincing evidence' an injury caused by the defendant's violation of one or more of the provisions of the criminal theft laws found in Fla. Stat. §§ 812.012–037." *Almeida v. Amazon.com, Inc.*, 456 F.3d 1316, 1326-27 (11th Cir. 2006).  Although Plaintiff does not cite a specific criminal statute, he appears to allege a violation of the criminal theft statute, Fla. Stat. § 812.014.  Therefore, to succeed in a claim for civil theft under Florida law, Plaintiff must demonstrate that Defendant "(1) knowingly (2) obtained or used, or endeavored to obtain or use, [Plaintiff's] property with (3) 'felonious intent' (4) either temporarily or permanently to (a) deprive [Plaintiff] of [his] right to or a benefit from the property or (b) appropriate the property to [Defendant's] own use or to the use of any person not entitled to the property." *United Technologies Corp. v. Mazer*, 556 F.3d 1260, 1270 (11th Cir. 2009) (citing Fla. Stat. §§ 772.11 (providing civil remedy for theft or exploitation), 812.014(1) (criminal theft statute); *Almeida v. Amazon.com, Inc.,* 456 F.3d 1316, 1326–27 (11th Cir. 2006)).  In addition, "is it essential that the victim have a legally recognized property interest in the items stolen." *Anthony Distributors, Inc. v. Miller Brewing Co.*, 941 F. Supp. 1567, 1575 (M.D. Fla. 1996).  Under Florida law, every element "of civil theft must be proven by clear and convincing evidence, which is an intermediate standard, between the preponderance of the evidence standard and the criminal

14

beyond a reasonable doubt standard." *Id.* (quoting *Small Business Administration v. Echevarria*, 864 F. Supp. 1254, 1264–65 (S.D. Fla. 1994)).

With respect to Plaintiff's investments in Catalina and Somerset Shoppes, LLC, Defendant argues that summary judgment should be granted because Plaintiff has not offered any evidence of felonious intent, and because Defendant has not committed theft. [DE 64 at 9-10]. Specifically, Defendant argues that Plaintiff cannot prove theft because Plaintiff:

> still owns his Class B membership interests in both Catalina Shoppes Fla LLC and Somerset Shoppes Fla LLC. Thus, it is hard to claim civil theft when there has been no theft. It is even harder to claim civil theft when the claimant still owns the alleged stolen property. And it rises to the level of absurdity when the Plaintiff, recognizing that he still owns a percentage interest in each of the two entities, then files a separate lawsuit (the New York Lawsuit) for 'equitable rescission' claiming he made a mistake and now wants his investment back.

[DE 64 at 10]. In his response, Plaintiff appears to argue that Defendant has misconstrued the basis of his civil theft claim. Rather than claiming Defendant stole his Class B membership interests in Catalina and Somerset, Plaintiff argues that because of its unfairness, *the investment itself* robbed Plaintiff of his $2,445,000 bonus. [DE 75 at 14-15]. Specifically, Plaintiff alleges that Defendant:

> kept [Plaintiff's] bonuses worth $2,445,000, and put them into 'investments' that by their terms need never be returned to [Plaintiff], and that will likely never be repaid in full. That is an unlawful exercise of control over [Plaintiff's] bonuses, whatever the contractual legerdemain by which the swindle was accomplished.

[DE 75 at 15]. As to Defendant's argument that Plaintiff has not offered any evidence of felonious intent to commit theft, Plaintiff counters that Defendant:

> contends that, despite the lack of any supporting writing, Mr. Tulepan's *compensation* depended on Mr. Roberts's gains in the values of all the Florida commercial properties Mr. Roberts acquired during Mr. Tulepan's employment – not just the Somerset and Catalina properties in which Mr. Roberts invested Mr. Tulepan's bonuses – *and that Mr. Tulepan would be required to pay Mr. Roberts for any declines in these unrelated properties.* [DE 74-11 at 2, ¶ 7.] Mr. Roberts offered Mr. Tulepan a revised Employee Compensation agreement in 2012 with such a term, [*Id.*] but Mr. Tulepan refused to sign it. [DE 74-2 at 252-53.] Mr.

15

Roberts's own lawyer, Arnold Mandell, testified that Mr. Roberts's proposed 2012 contract did not reflect the parties' employment agreement, which Mr. Mandell testified was stated in the 2004 and 2010 Employee Compensation agreements. [DE 74-5 at 23-27.] . . . Mr. Roberts contends that Mr. Tulepan's bonuses – *Mr. Tulepan's compensation that accrued in 2007 by the plain terms of the parties' 2004 contract* – remain subject to forfeit at any time *while in Mr. Roberts's possession* depending on Mr. Roberts's estimate of the gains or losses of other, unrelated properties in which Mr. Tulepan has no interest, that Mr. Roberts purchased during Mr. Tulepan's tenure.

[DE 75 at 4-5] (emphasis in original). Plaintiff also argues that Defendant instructed his lawyer "to include terms in the [Amended Operating Agreements] that cause [Plaintiff] to lose most or all of his invested bonuses unless the shopping centers increase dramatically in value. This 'investment,' as ultimately realized by the 2008 agreements is a swindle that allows [Defendant] to pocket [Plaintiff's] money." [DE 75 at 3] (citing [DE 74-9 at 4-8]). *See also* [DE 74-9, Walsh Expert Report at 4-8] (finding that under the Amended Operating Agreements, the properties would have to dramatically increase in value for Plaintiff to recover – let alone profit from – his investments).

Having reviewed the record in this case, the Court finds that Plaintiff has failed to advance sufficient record evidence of Defendant's felonious intent to steal Plaintiff's $2,445,000. As Plaintiff notes, Defendant's proposed 2012 contract, which would have required Plaintiff to pay Defendant for any decrease in the value of a property, *see* [DE 74-11 at 2, ¶ 7], did *not* reflect or become the parties' ultimate employment agreement. Defendant, Asher Brukner (Defendant's accountant charged with negotiating the Amended Operating Agreements), and Arnold Mandell (Mr. Roberts's attorney charged with drafting the Amended Operating Agreements) have all testified that it was Defendant's intent, in entering into the Amended Operating Agreements for Somerset Shoppes LLC and Catalina Shoppes LLC with Plaintiff in January 2008, for Plaintiff to share in any gains and any losses in the value of those entities, respectively. [DE 74 – Ex. 1 at 131-132.; DE 74 – Ex. 8 at 61-66; DE 74 – Ex. 5 at 116-117]. Mr. Brukner further testified that

16

he believes the ultimate Amended Operating Agreements achieve those objectives. [DE 74-8 at 65]. In addition, Mr. Mandell testified that the Amended Operating Agreements were negotiated at arm's length, and that it was the parties' intention that if the properties were sold for a net profit, Plaintiff would recoup his investment and further profit from it. [DE 74-5 at 114-118]. Even Plaintiff admits that under the terms of the Amended Operating Agreements, if and when Somerset and/or Catalina Shoppes are sold, Plaintiff will recover at least some of his investment. In sum, the evidence suggests that Plaintiff will recover his investments upon sale of the properties, provided that a profit has been shown following the payment of expenses, [DE 74-6, DE 74-7], and that this was Defendant's intent.

Although Plaintiff argues that the jury should be allowed to assess Defendant's demeanor to determine whether Defendant is being truthful about his intent with respect to the Amended Operating Agreements, it is *Plaintiff's* burden under the Florida Civil Theft Statute to prove civil theft by "clear and convincing evidence." Fla. Stat. § 772.11. *See Almeida*, 456 F.3d 1316 (affirming district court's grant of summary judgment on civil theft count upon finding that plaintiff failed to present clear and convincing evidence of felonious intent). Because Plaintiff has not shown that Defendant possessed felonious intent to steal Plaintiff's investment of $2,445,000 by clear and convincing evidence, summary judgment is granted to the extent Plaintiff argues civil theft of his investment.

Turning to Plaintiff's unpaid wages, the Court reiterates that to establish a viable claim for civil theft where the parties have a contractual relationship, the theft must go beyond, and be independent from, a failure to comply with the terms of the contract. *Walker*, 59 So. 3d at 190; *Rosenthal Toyota, Inc. v. Thorpe*, 824 F.2d 897, 902 (11th Cir. 1987) (citing *Rosen v. Marlin*, 486 So.2d 623, 624 (Fla. 3d DCA), *rev. denied*, 494 So.2d 1151 (Fla. 1986)). Defendant

argues that summary judgment should be granted as to Plaintiff's unpaid wages because "each and every one of the damage claims alleged are specifically addressed by the terms of the parties' written contracts." [DE 64 at 15].   Indeed, the unpaid wages, interest, and unreturned investments at issue in Count II are identical to those at issue in Count I. [DE 11 at ¶¶ 93-102]. For the reasons discussed in greater detail in Count I, namely, because there is a contractual relationship between the parties, and because that relationship plainly encompasses the alleged theft of Plaintiff's unpaid wages, summary judgment is also granted to the extent Plaintiff argues civil theft of his unpaid wages. *Walker*, 59 So. 3d at 190.

### Count III: Breach of Trust/Constructive Trust[7]

In Count III, Plaintiff alleges three ways in which a fiduciary relationship exists between Defendant and Plaintiff.   [DE 11 at ¶ 104].   The elements of a claim for breach of trust or fiduciary duty under Florida law are:   "(1) the existence of a fiduciary duty; (2) the breach of that duty; and (3) damage proximately caused by that breach." *Treco Int'l S.A. v. Kromka*, 706 F. Supp. 2d 1283, 1288 (S.D. Fla. 2010); *see also Servicios De Almacen Fiscal Zona Franca Y Mandatos S.A. v. Ryder Int'l, Inc.*, 264 F. App'x 878, 881 (11th Cir. 2008) (finding that existence of a fiduciary relationship must be established before a constructive trust claim can be raised). The burden of proving a fiduciary relationship is on Plaintiff in this case. *See Orlinsky v. Patraka*, 971 So. 2d 796, 800 (Fla. Dist. Ct. App. 2007) ("A fiduciary relationship must be established by competent evidence, and the burden of proving such a relationship is on the party asserting it.").

---

[7] Although Count III is labeled "Breach of Trust/Constructive Fraud," [DE 11 at 24], counsel for Plaintiff later clarified that the term "Constructive Fraud" in the title was a typographical error, and should read "Constructive Trust." [DE 20 at 14].

Plaintiff first contends that Defendant owed him, as a minority member of Somerset LLC and Catalina LLC, a fiduciary duty based on Defendant's alleged role as the managing member of the LLCs. [DE 75 at 10]. Somerset Shoppes Management LLC and Catalina Shoppes Management LLC are both Delaware limited liability companies, governed by Delaware law. [DE 65-4 at 1; DE 65-5 at 1]. The elements of breach of fiduciary duty claim under Delaware law are "(1) that the fiduciary duty exists and (2) that the fiduciary breached that duty." *In re Tropicana Entm't, LLC*, 520 B.R. 455, 470 (Bankr. D. Del. 2014) (citing *York Lingings v. Roach,* No. 16622–NC, 1999 WL 608850, *2 (Del. Ch. July 28, 1999)). "For a fiduciary duty to exist, there must first be a fiduciary relationship." *Id.* Under Delaware law, managers or managing members of an LLC owe traditional fiduciary duties of loyalty and care to each other and to the company unless those duties are eliminated, restricted, or otherwise displaced by express language in the LLC operating agreement. *2009 Caiola Family Trust v. PWA, LLC*, No. CV 8028-VCP, 2014 WL 7232276, at *8 (Del. Ch. Dec. 18, 2014) (citing 6 Del. C. 18-1104 ("A limited liability company organized under Delaware law 'may displace fiduciary duties altogether or tailor their application" by the terms of its operating agreement. As a default rule, however, managing members of LLCs owe traditional fiduciary duties of loyalty and care.")); *see also Feeley*, 62 A.3d at 663 (Del. Ch. 2012); *Kelly v. Blum*, No. 4516-VCP, 2010 WL 629850, at *1 (Del. Ch. Feb. 24, 2010). The parties dispute, however, whether Defendant is the managing member of Somerset LLC and Catalina LLC. [DE 91 at 12, ¶ 1].

Even assuming Defendant was in a fiduciary relationship with Plaintiff based on his position with the LLCs, Plaintiff has not established a claim for breach of fiduciary duty. Plaintiff does not allege any breach of duty as to the management of the LLCs, with the exception that Defendant, as alleged manager of the LLCs, "refus[ed] to account for or return

[Plaintiff's] investments in Somerset Shoppes and Catalina Shoppes." [DE 11 at ¶ 104]. Plaintiff, however, has failed to demonstrate any duty owed by Defendant, as alleged manager of the LLC, to return Plaintiff's LLC interest upon termination from employment or at Plaintiff's demand. Further, Plaintiff does not explain how Defendant's failure to provide Plaintiff with appraisals of the two properties covered by the LLCs harmed Plaintiff.[8] As to Count III, Plaintiff alleges that Defendant's "breaches have effectively ended [Plaintiff's] working life by leaving [Plaintiff] in a position where he is unable to find a suitable replacement job." [*Id.* at ¶ 107]. He further alleges he has been damaged "in the amount of $7,037,137, plus prejudgment interest running from August 6, 2014." [*Id.* at ¶ 109]. It appears Plaintiff's damages result from his inability to redeem or cash out his membership interests in the LLCs, not from any breach of fiduciary duty. Plaintiff cannot, therefore, establish a claim of breach of fiduciary duty as to the LLCs under Delaware law.[9]

Next, Plaintiff argues Defendant owes him a fiduciary duty "because [Plaintiff] placed his trust in [Defendant] by offering his principal asset to [Defendant] for investment in [Defendant's] companies under the parties' Investment Agreement, on a handshake, and [Defendant] accepted [Plaintiff's] trust." [*Id.* at ¶ 105]. In his Response [DE 75], Plaintiff emphasizes that Defendant's oral "retention in trust of [Plaintiff's] bonuses is separate, in time and import, from the parties' eventual decision, seven months later, to invest [Plaintiff's] bonus money in two companies . . . in exchange for a (worthless) "Class B" membership interest in each, and then to memorialize

---

[8] In his Complaint, Plaintiff alleges that in 2013, Defendant told him "we are conducting an accounting of the properties so we may reconcile the amount owed to you." [DE 11 at ¶ 64]. Plaintiff further alleges that Defendant "did not offer [Plaintiff] an opportunity to participate in the accounting," [*id.* at ¶ 65], and did not provide Plaintiff with "the accounting he claimed to have taken . . . contrary to the fiduciary duties [Defendant] owes [Plaintiff]." [*Id.* at ¶ 66].

[9] The result would be the same under Florida law.

that decision several months later in [Amended Operating Agreements] for the two companies."
[DE 75 at 10].

Nevertheless, the record evidence indicates that Defendant did not owe Plaintiff a fiduciary duty under Florida law. "For a confidential or fiduciary relationship to exist under Florida law 'there must be substantial evidence showing some dependency by one party and some undertaking by the other party to advise, counsel, and protect the weaker party.'" *Muniz v. GCA Servs. Grp., Inc.*, No. 3:05 CV 172 J 33MMH, 2006 WL 2130735, at *10 (M.D. Fla. July 28, 2006) (citing *Lanz v. Resolution Trust Corp.,* 764 F. Supp. 176, 179 (S.D.Fla.1991). "Further, '[t]he fact that one party places trust or confidence in the other does not create a confidential relationship in the absence of some recognition, acceptance or undertaking of the duties of a fiduciary on the part of the other party.'" *Id.* (citing *Harris v. Zeuch,* 103 Fla. 183, 137 So. 135 (1931); *Barnett Bank of W. Florida v. Hooper,* 498 So. 2d 923 (Fla.1986)). Here, the record indicates that Plaintiff and Defendant were dealing at arm's length. *See Servicios De Almacen Fiscal Zona Franca Y Mandatos S.A.*, 264 F. App'x at 881-82 ("when the parties are dealing at arm's length, a fiduciary relationship does not exist because there is no duty imposed on either party to protect or benefit the other."). Plaintiff is an experienced real estate professional. It was Plaintiff who identified the Somerset and Catalina properties for Defendant to purchase in the first instance. Plaintiff managed both properties before and after Plaintiff invested his own bonus into the properties. [DE 74 – Ex. 2, Tulepan Depo. at 39, 42-44, 65-66, 318-319]. Moreover, although Plaintiff's deposition testimony indicates otherwise, the Complaint unambiguously states that it was *Plaintiff* who approached *Defendant* with an offer to invest his own bonus payments into Somerset and Catalina Shoppes in exchange for an equity interest in those entities. Specifically, the Complaint alleges:

21

> Mr. Tulepan offered, in lieu of receiving the bonus payments, to take an equity interest in Somerset Shoppes and Catalina Shoppes. Mr. Tulepan made the offer to demonstrate his loyalty to Mr. Roberts. Mr. Roberts immediately agreed to the investment, and expressed his enthusiasm for the arrangement and its effect of aligning the parties' interests in increasing the value of the properties.

[DE 11 at ¶ 20].  *See Cooper v. Meridian Yachts, Ltd.*, 575 F.3d 1151, 1177 (11th Cir. 2009) ("[T]he general rule [is] that a party is bound by the admissions in his pleadings.").  Plaintiff alleges that he placed his trust in Defendant.  [DE 11 at ¶ 21].  However, there are no clear allegations or evidence that Defendant accepted this trust.  Moreover, even if a fiduciary relationship did exist between Plaintiff and Defendant, Plaintiff has failed to articulate what duty has been breached with respect to the parties' oral Investment Agreement.

Finally, Plaintiff argues that Defendant violated his fiduciary obligation, as Plaintiff's employer, "to abide [by] the parties' agreements, to pay [Plaintiff] his wages earned under the parties' Restated [Employee Compensation Agreement], and to treat [Plaintiff] fairly in accord with the terms of Restated [Employee Compensation Agreement]."  [DE 11 at ¶ 106]. Specifically, Plaintiff alleges Defendant violated his fiduciary obligation " by breaching the Contract's five-year term, by firing [Plaintiff] without cause, notice or explanation, and by withholding wages owed to [Plaintiff] under the Restated [[Employee Compensation Agreement]." [*Id.*].  Although an employee-employer relationship sometimes creates a fiduciary relationship[10], "[u]nder Florida law, a cause of action for breach of fiduciary duty will not lie where the claim of breach is dependent upon the existence of a contractual relationship between the parties."  *Detwiler v. Bank of Cent. Florida*, 736 So. 2d 757, 759 (Fla. Dist. Ct. App. 1999) (citing *Greenfield v. Manor Care, Inc.,* 705 So. 2d 926, 932 (Fla. 4th DCA 1997), *rev. denied*, 717 So. 2d 534 (Fla. 1998)). "This is true because the duty is owed only as a result of the

---

[10] *See, e.g., Heritage Schooner Cruises, Inc. v. Cansler*, No. 13-22494-CIV, 2013 WL 5636689, at *4 (S.D. Fla. Oct. 16, 2013).

existence of the contract." [*Id.*].  Since all of the allegations at issue here arise out of the parties'

contractual relationships, summary judgment is granted in favor of Defendant as to Count III.

### Counts IV and V: Recovery of Unpaid Wages; Breach of Employee Compensation Contract

In Count IV, Plaintiff alleges he "is entitled to payment of his unpaid wages [due under

the Restated Employee Compensation Agreement] and prejudgment interest under Florida

common law. [DE 11 at ¶¶ 113-114].  He further alleges he is also entitled to "recovery of the

costs and attorney fees incurred in prosecuting this action as provided by Fla. Stat. § 448.08."

[*Id.* at ¶ 114].   Count V alleges Plaintiff "performed his obligations under the Restated

Employ[ee Agreement]" and Defendant breached the Restated Employee Compensation

Agreement by refusing to pay Plaintiff the following:

> (a)     The $25,000 transaction fee owed upon closing of the 2012 Somerset
>         Shoppes refinancing;
>
> (b)     Twenty-one months of compensation and expenses owed for the remainder
>         of the Contract's five-year term, from August 6, 2013, to May 10, 2015, in
>         the amount of $439,670; and
>
> (c)     Bonus owed under Paragraph 5(b), in an amount believed to exceed $1.2
>         million.

[*Id.* at ¶¶ 116-118].  Plaintiff further alleges Defendant "breached the Restated Employ[ee

Compensation Agreement] by terminating it immediately, in breach of the five-year term, and

without the required 90-day notice, on August 6, 2013." [*Id.* at ¶ 120].

Defendant argues that summary judgment should be granted as to Counts IV and V

because "the amount of compensation allegedly owed based on the terms of the [Restated

Employment Agreement] cannot be accurate and must be limited . . . to the 90 day time period

which [Plaintiff] admits is part of the contract upon which he relies." [DE 64 at 10].

Under Florida law, "where the language of a contract is unambiguous and not subject to conflicting inferences, construction of the contract is a question of law for the court, not a question of fact for the jury." *Weingart v. Allen & O'Hara, Inc.*, 654 F.2d 1096, 1103 (5th Cir. 1981) (citing *Friedman v. Virginia Metal Prod. Corp.*, 56 So. 2d 515, 516 (Fla. 1952); *Ellenwood v. Southern United Life Ins. Co.*, 373 So. 2d 392, 394 (Fla. App. 1979); *Atlantic Coast Line R.R. Co. v. Boone*, 85 So. 2d 834, 842 (Fla.1956). "Also, where there is an ambiguity in the contract and the facts are not in dispute, it is the province of the court, not the jury, to resolve the ambiguity as a matter of law." *Id.* (citing *Ellenwood*, 373 So. 2d at 394).

In this case, the parties agree that the Restated Employee Compensation Agreement [DE 11-2], dated May 10, 2010, contains the following terms:

> Term: Five (5) years with provision for extension if agreed to by both parties. 90 day written notice to terminate by either party. . . .
>
> In the event that the Agreement is terminated by either party, employee shall receive compensation above, prorated to the date of termination.

[DE 11-2].[11]   However, the parties dispute whether the Restated Employee Compensation Agreement is for a definite term or terminable at will.  [DE 75 at 19].  Assuming the Restated Employee Compensation Agreement is for a definite term, the parties also dispute whether that term is 90 days or five years.  [*Id.*]

"The general rule of law in Florida is that an employment contract without a definite term is terminable at will, and no cause of action may be maintained for its termination." *Raytheon Subsidiary Support Co. v. Crouch*, 548 So. 2d 781, 782 (Fla. 4th DCA 1989) (citing *DeMarco v. Publix Super Markets, Inc.*, 384 So.2d 1253 (Fla. 1980); *Roy Jorgensen Associates, Inc. v. Deschenes*, 409 So. 2d 1188 (Fla. 4th DCA 1982); *Crawford v. David Shapiro & Co.*, 490 So. 2d

---

[11] The parties also agree that the original Employee Compensation Agreement [DE 11-1], dated June 25, 2004, contains essentially identical terms.

24

993 (Fla. 3d DCA 1986)). "Additionally, mere expectations are insufficient to create a binding term of employment." *Id.* (citing *Maguire v. American Family Life Assurance Co. of Columbus, Georgia,* 442 So.2d 321 (Fla. 3d DCA 1983)). In this case, however, the Restated Employee Compensation Agreement specifically provides that the term is "5 years." [DE 11-1; DE 11-2]. The Restated Employee Compensation Agreement's provision for "90 day written notice to terminate by either party" is consistent with a contract for a definite term. If the parties had the absolute right under the contracts to terminate their relationship at will, there would be no need for such a provision.[12]

The parties agree that Defendant failed to provide Plaintiff with the required 90 days' written notice of termination, but dispute whether this breach entitles Plaintiff to lost wages for the entire duration of the contract, or whether Plaintiff's claim for lost wages is limited to those 90 days. Under Florida law, where an employer terminates an employment contract prior to the end of the contract's specified term, the employee is generally entitled to wages for the entire unexpired term of the contract in addition to any unpaid balance for services rendered. *Juvenile Foundation v. Rievman,* 370 So. 2d 33 (Fla. 3d DCA 1979). However, where the parties have the right to terminate the contract prior to the end of the contract's term, through a 90-day written notice provision, for example, a terminated employee is not entitled to lost wages for the entire length of the contract. *See Bernhardt v. Jacksonville Medical Center, Inc.,* 543 So. 2d 833, 835 (Fla. 1st DCA 1989) (quoting *Juvenile Foundation v. Rievman,* 370

---

[12] *See Raytheon Subsidiary Support Co.*, 548 So. 2d at 783 ("These particularized rights and remedies, which cover various contingencies, are only consistent with a contract for a definite term. If Raytheon had the right under the contract to terminate an employee without due cause and with no repercussion to itself, there would be no necessity for Raytheon to expressly protect itself under circumstances in which an employee is terminated with due cause.").

So.2d 33, 35-36 (Fla. 3d DCA 1979)). This is true even where the contract requires advanced notice of termination, and the employee is nonetheless terminated *immediately* in clear violation of the notice requirement. Under those circumstances, the terminated employee may only recover lost wages for the duration of the contractual notice period (in the instant case, 90 days). *See, e.g., Akzo Nobel Coatings, Inc. v. Auto Paint & Supply of Lakeland, Inc.*, No. 2011 WL 5597364, *4-5 (M.D. Fla. Nov. 17, 2011); *Bernhardt v. Jacksonville Medical Center, Inc.*, 543 So. 2d 833 (Fla. 1st DCA 1989); *Treasure Lake of Georgia, Inc. v. Harold Miller Marketeer, Inc.*, 358 So. 2d 111 (Fla. 3d DCA 1978).

In *Bernhardt*, for example, the employment contract provided for automatic renewal at the end of its one-year term unless either party provided the other with notice of their intent not to renew the contract at least three months (90 days) prior to the term's end. *Bernhardt*, 543 So. 2d at 834. The employer in that case breached the contract's notice requirement, firing the employee without providing the requisite three months' notice. The court held that the employee's damages were limited to "three months of his average monthly income in addition to . . . income from services rendered." *Id.* at 835. Such a holding is consistent with the principle that the contract damages should place the injured party in the same financial position he would have occupied if the contract had been fully performed, but not in a better position. *Juvenile Foundation*, 370 So. 2d 33; *Larry Hobbs Farm Equipment*, 2008 WL 3931323, at *4. Here, assuming that Defendant had provided Plaintiff the requisite 90-days' notice on August 6, 2013 (rather than terminating the contract immediately), Plaintiff would have earned wages under the Restated Employee Compensation Agreement for an additional 90 days. Allowing Plaintiff to recover wages for any period exceeding 90 days would provide Plaintiff with an unjustified windfall. *See Treasure Lake of Georgia*, 358 So. 2d 111;

26

*Bernhardt*, 543 So. 2d 833; *Akzo Nobel Coatings*, 2011 WL 5597364, \*4-5; *Larry Hobbs Farm Equipment*, 2008 WL 3931323.    Accordingly, summary judgment is granted in favor of Defendant to the extent Plaintiff seeks more than 90 days of unpaid wages under Counts IV and V.

### Punitive Damages

Under Florida law, punitive damages are not recoverable in a breach of contract action absent an accompanying underlying tort.    *Roger Lee, Inc. v. Trend Mills, Inc.*, 410 F.2d 928 (5th Cir. 1969) ("punitive damages are not generally recoverable under an action for breach of contract"); *Lewis v. Guthartz*, 428 So. 2d 222 (Fla. 1983); *Masciarelli v. Maco Supply Corp.*, 224 So. 2d 329 (Fla. 1969).   Given that summary judgment has been granted in favor of Defendant as to all of Plaintiff's tort claims and only contract claims remain, Plaintiff's claims for punitive damages must also be dismissed.

### CONCLUSION

Counts I, II, and III are dismissed.  Count IV shall proceed to trial to the extent Plaintiff seeks 90 days of unpaid wages under the Restated Employee Compensation Agreement.  Count V shall proceed to trial to the extent Plaintiff seeks 90 days of unpaid wages, a $25,000 transaction fee, and a bonus under the Restated Employee Compensation Agreement.  Count VI proceeds to trial in its entirety.

## II.    MOTION TO DISMISS FOR FAILURE TO JOIN INDISPENSABLE PARTIES [DE 70]

Defendant moves to dismiss the Amended Complaint for failure to join indispensable parties under Rule 19, arguing that this case cannot proceed without Catalina, Somerset, CST Heron, and Tulepan Management.

27

## STANDARD

"Dismissal of an action pursuant to Fed. R. Civ. P. 12(b)(7), for failure to join a party under Fed. R. Civ. P. 19, is a 'two-step inquiry.'" *Raimbeault v. Accurate Mach. & Tool, LLC*, 302 F.R.D. 675, 682 (S.D. Fla. 2014) (citing *Focus on the Family v. Pinellas Suncoast Transit Authority,* 344 F.3d 1263, 1279 (11th Cir. 2003)).

First, a court must decide whether an absent party is a necessary party in the case under Rule 19(a). *Int'l Importers, Inc. v. Int'l Spirits & Wines, LLC*, 2011 WL 7807548, at *8 (S.D. Fla. July 26, 2011) (citing *Molinos Valle del Cibao v. Lama*, 633 F.3d 1330, 1344 (11th Cir. 2011)). "If a court determines that an absent party does satisfy the Rule 19(a) criteria, i.e., that the party is a required party, the court must order that party joined if its joinder is feasible." *Raimbeault*, 302 F.R.D. at 682 (citing Fed. R. Civ. P. 19(a)(2)). If the absent party is not required, the litigation continues as initiated by Plaintiff. *See, e.g., Developers Sur. & Indem. Co. v. Harding Vill., Ltd.,* 2007 WL 465519, at *2 (S.D. Fla. Feb. 9, 2007). "A party is not necessary simply because joinder would be convenient, or because two claims share common facts." *Raimbeault*, 302 F.R.D. at 682 (internal quotation and citation omitted). Rather, an absent party is considered necessary "(i) if, in its absence, the court cannot accord complete relief among the existing parties to the action; (ii) if the nonparty's absence would have a prejudicial effect on that party's ability to protect its interest relating to the subject of the action; or (iii) if, due to the absent party's related interest, the nonparty's absence would leave the existing parties at a substantial risk of incurring inconsistent obligations upon the court's disposition of the current action. *Id.* (citing Fed. R. Civ. P. 19(a)(1); *City of Marietta v. CSX Transp. Inc.*, 196 F.3d 1300, 1305 (11th Cir. 1999)).

Second, if a necessary party cannot be joined, the court must consider whether "in equity and good conscience, the action should proceed among the existing parties or should be dismissed." Fed. R. Civ. P. 19(b); *Challenge Homes, Inc. v. Greater Naples Care Ctr., Inc.*, 669 F.2d 667 (11th Cir. 1982).

Rule 19(b) enumerates the four most significant factors in determining whether an absent party is indispensable: (1) the extent to which a judgment rendered in the person's absence might prejudice that person or the existing parties; (2) the extent to which any prejudice could be lessened or avoided by protective provisions in the judgment, shaping the relief, or other measures; (3) whether a judgment rendered in the person's absence would be adequate; and, (4) whether the plaintiff would have an adequate remedy if the action were dismissed for non-joinder. Fed. R. Civ. P. 19(b); *Doty v. St. Mary Parish Land Co.*, 598 F.2d 885, 887 (5th Cir. 1979) ("A district court may refuse to proceed with the action if prejudice would result to either the absent party or to parties already joined"); *Raimbeault*, 2014 WL 4954237, at *8.

In cases challenging the enforceability or validity of a contract, joinder of all parties to that contract will typically be required. *Harrell and Sumner Contracting Co. v. Peabody Petersen Co.*, 546 F.2d 1227, 1228-29 (5th Cir. 1977) ("in an action brought on a partnership contract, all members of the partnership are indispensable parties"); *Raimbeault*, 2014 WL 4954237, at *9. This is true primarily because the absent contract-party has a legally protected interest in the outcome of the litigation. *Raimbeault*, 2014 WL 4954237, at *9. In addition, non-joinder of a contract-party would undermine the court's ability to render complete relief among existing parties, since the absent party would not be bound by the court's judgment on the challenged contract. *Id.*; *see also*, *Spear Group, Inc. v. Florida*

*Power & Light Co.,* 2014 WL 272724, at *3 (Jan. 23, 2014) (absent party deemed "required" under Rule 19(a) because plaintiff was suing to recover monies under its contract with the absent party, and to resolve the dispute, the court would be required to adjudicate the absent party's rights under the contract).

## DISCUSSION

Defendant argues that "in his Amended Complaint, [Plaintiff] ignores the company that issued his paycheck (Tulepan Management, LLC) and all four contracts, and the parties who signed them, and has decided to simply name Bob Roberts individually as the sole defendant." [DE 70 at 2]. Specifically, Defendant argues:

> Catalina Somerset, Tulepan Management and CST Heron are all necessary parties to this suit because: (i) the question of whether Craig Tulepan is entitled to a "return" of his investment is governed by the terms of the various operating agreements to which Tulepan, Catalina and Somerset are parties; (ii) in the event that this Court orders the requested return of capital, as Tulepan hopes, it will require the Court to rule on and interpret the terms of those operating agreements; (iii) if the Court orders a return of Tulepan's investment capital it will negatively impact the operation of those two entities (simply, they will have less operating capital); (iv) to the extent that any decision of this Court will impact the operation of Catalina and Somerset those entities have the right to come in to this case as parties and defend it; (v) that the presence of these parties is required has now become crystal clear by the filing of the New York Action which involves the very same transaction (Tulepan's investment into the shopping centers, the same shopping centers (Catalina and Somerset) and the same Plaintiff, Tulepan; (vi) the payment of interest, as all parties testified in this case, is governed by the terms of two separate independent contractor agreements between CST Heron and Catalina and Somerset and none of those companies are parties to this action; and (viii) finally, Craig Tulepan is suing for "unpaid wages" yet he has failed to name as a party his employer – Tulepan Management.

[DE 70 at 3-4].

However, Defendant mischaracterizes the claims alleged in the Amended Complaint. Rather than being based on the "the [Amended Operating Agreements] to which Tulepan, Catalina and Somerset are parties," the Amended Complaint pled various tort claims

against Defendant, and breaches of contracts between Plaintiff and Defendant only.  The only claim tangentially related to the Amended Operating Agreements with Catalina and Somerset was Plaintiff's breach of trust claim.  However, the Court has granted summary judgment in favor of Defendant as to this claim.

At this juncture, the only claims left before the Court are Defendant's alleged breach of the Restated Employee Compensation Agreement (Counts IV and V) and Defendant's alleged breach of the oral Investment Agreement (Count VI).  The 2004 Employee Compensation Agreement was signed by Plaintiff and Defendant in their individual capacities. [DE 11-1].  The Restated Employee Compensation Agreement, which contained essentially identical terms, was signed only by Plaintiff.  [DE 11-2].  There was a blank signature line for "Bob Roberts."  [*Id.*]. Although Defendant argues that Tulepan Management was Plaintiff's employer, and that Plaintiff was paid by this entity, Tulepan Management is not a party to the Restated Employee Compensation Agreement.  [DE 11-2].  Neither has Defendant provided any evidence to demonstrate that Defendant assigned any obligations under the Restated Employee Compensation Agreement to Tulepan Management.  In addition, Defendant does not argue that anyone besides Plaintiff and Defendant was a party to the oral Investment Agreement.  Finally, while a party may move even at trial for Rule 19 joinder, "undue delay in making the motion can properly be counted against him as a reason for denying the motion.  A joinder question should be decided with reasonable promptness."  Fed. R. Civ. P. 19, Advisory Committee Note (1966 amendment).  Defendant does not allege discovery disclosed some latent reason for joinder, but rather appears to have slept on this argument for eight months.  Accordingly, Defendant's Motion to Dismiss for Failure to Join Indispensable Parties is denied and it is hereby

**ORDERED AND ADJUDGED** as follows:

1. Defendant's Motion for Partial Summary Judgment as to Counts I, II, III, IV, and V [DE 64] is **GRANTED**;

2. Defendant's Motion to Dismiss the Amended Complaint for Failure to State a Claim [DE 14] is **DENIED AS MOOT**;

3. Defendant's Motion to Strike Claims for Punitive Damages [DE 15] is **DENIED AS MOOT**; and

4. Defendant's Motion to Dismiss the Amended Complaint for Failure to Join Indispensable Parties [DE 70] is **DENIED**.

**SO ORDERED** in Chambers at West Palm Beach, Florida, this 16 day of January, 2015.

DONALD M. MIDDLEBROOKS
UNITED STATES DISTRICT JUDGE

Copies to:    Counsel of Record